**608**

Jennifer EASTER, individually and on behalf of B.E., a minor, Plaintiffs,

v.

CAYUGA MEDICAL CENTER AT ITHACA PREPAID HEALTH PLAN, Cayuga Medical Center at Ithaca, and Excellus Health Plan, Inc., d/b/a Excellus BlueCross Blueshield, Defendants.

5:14–CV–1403 (BKS/TWD)

United States District Court, N.D. New York.

Signed November 15, 2016

For Plaintiffs: Carla N. McKain, Esq., McKain Law, PLLC, 136 E. State St.,

Ithaca, NY 14850, Oliver N. Blaise, III, Esq., Coughlin & Gerhart, LLP, 99 Corporate Drive, Binghamton, NY 13904

For Defendants Cayuga Medical Center at Ithaca Prepaid Health Plan and Cayuga Medical Center at Ithaca: Christina M. Petrella, Esq., Harris Beach PLLC, 99 Garnsey Road, Pittsford, NY 14534

For Defendant Excellus: Robert Kirchner, Esq., John P. Wright Jr., Esq., Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, NY 13202

## MEMORANDUM–DECISION AND ORDER

Hon. Brenda K. Sannes, United States District Court Judge:

## I. INTRODUCTION

Plaintiff Jennifer Easter brings this action on behalf of her son, B.E., under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* In the Second Amended Complaint, Plaintiffs allege that Defendants Cayuga Medical Center at Ithaca Prepaid Health Plan ("Plan"), Cayuga Medical Center ("CMC"),[1] and Excellus Health Plan, Inc. ("Excellus") violated ERISA with their "denial of Plaintiffs' claims for medical benefits and failure to provide requested

information." (Dkt. No. 27, p. 1). Currently pending before the Court are the CMC Defendants' motion for summary judgment (Dkt. No. 41), Excellus' motion for summary judgment (Dkt. No. 42), and Plaintiffs' cross-motion for summary judgment (Dkt. No. 43). For the reasons set forth below, each party's motion for summary judgment is granted in part and denied in part. The Court remands consideration of Plaintiffs' claims for benefits to Defendants for renewed consideration in accordance with this Opinion.

## II. BACKGROUND[2]

### A. Plaintiffs' Allegations Regarding B.E.'s Treatment History[3]

B.E. is a minor dependent of Plaintiff Easter, who is an employee of the Cayuga Medical Center at Ithaca. (Dkt. No. 43–3, ¶¶ 5–6; Dkt. No. 47–1, ¶¶ 5–6; Dkt. No. 48–1, ¶¶ 5–6). In 2006, when B.E. was eight years old, he received a "speech articulation evaluation at the Sir Alexander Ewing–Ithaca College Speech and Hearing Clinic" and was subsequently "referred for a comprehensive psychological education evaluation to aide [sic] in school placement and instructional planning." (Dkt. No. 27, ¶ 14; Dkt. No. 27–2, p. 2). A series of tests

---

1. Hereinafter, the Court refers to the Plan and CMC collectively as the "CMC Defendants."

2. The facts stated herein are drawn from the parties' submissions, including the CMC Defendants' Statement of Material Facts (Dkt. No. 41–22), Response to Plaintiffs' Statement of Material Facts (Dkt. No. 48–1), and Response to Plaintiffs' Additional Statement of Material Facts (Dkt. No. 50–1); Excellus' Statement of Material Facts (Dkt. No. 42–14), Response to Plaintiffs' Statement of Material Facts (Dkt. No. 47–1), and Response to Plaintiffs' Additional Material Facts (Dkt. No. 51–2); and Plaintiffs' Statement of Material Facts (Dkt. No. 43–3), Statement of Material Facts in Opposition to the CMC Defendants' Motion for Summary Judgment (Dkt. No. 45–1), and

Statement of Material Facts in Opposition to Excellus' Motion for Summary Judgment (Dkt. No. 46–1); as well as exhibits that accompany those statements. Where facts stated in a party's L.R. 7.1(a)(3) Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court has found such facts to be true. *See* N.D.N.Y. L.R. 7.1(a)(3); Fed. R. Civ. P. 56(e).

3. Facts alleged in Plaintiffs' Second Amended Complaint are included in Part II(A) solely to provide context. The Defendants dispute Plaintiffs' allegations, and Excellus asserts that the allegations are outside the administrative record. (Dkt. Nos. 33, 34).

performed by a psychologist "showed diversely developed cognitive abilities and inconsistencies in performance that are associated with learning disabilities" and the psychologist "recommended specific supportive strategies to improve B.E.'s academic performance." (Dkt. No. 27, ¶ 16; Dkt. No. 27–2, pp. 5, 10–11).

In 2009, when B.E. was eleven years old, school personnel "referred [him] for psychotherapy and [he] began working with ... a licensed therapist" over weekly outpatient meetings "to assist B.E. in managing distractibility, frustration, and organizational tasks." (Dkt. No. 27, ¶¶ 16–17; Dkt. 27–3, p. 2). The therapist "diagnosed B.E. with dysthymia ..., a reading disorder, an anxiety disorder not specified, and educational problems." (Dkt. No. 27, ¶ 18; Dkt. No. 27–3, p. 2). Though B.E. "initially responded well to traditional therapy," his progress "decline[d] considerably." (Dkt. No. 27, ¶ 19; Dkt. No. 27–3, pp. 2–3).

In this period, B.E. also "underwent a Comprehensive Neurodevelopmental Assessment at the Yellin Center for Student Success in New York City to obtain a learning profile which was used by B.E.'s elementary school to help B.E. academically." (Dkt. No. 27, ¶ 20; Dkt. No. 27–3, p. 3). B.E.'s parents "continued to consult with several doctors" through early 2010 "to evaluate and treat B.E.'s dysthymia and anxiety." (Dkt. No. 27, ¶ 21; Dkt. No. 27–3, p. 3).

"As B.E. entered adolescence, [his] emotional and academic functioning steadily deteriorated, and B.E.'s behavior raised concerns about both B.E.'s and others' safety." (Dkt. No. 27, ¶ 22; Dkt. No. 27–3, p. 3). Plaintiffs assert that relevant symptoms and incidents included: (1) "night terrors on a regular basis" that were "extremely violent and scary" and sometimes caused B.E. to be "afraid to go to sleep;" (2) "seem[ing] sad[ ] and develop[ing] a profound lack of interest and a loss of enthusiasm in doing most things;" (3) "irrational fears ... including a recurring fear that the sun would burn the earth," which would "very often ... when it was a bright, sunny morning" cause B.E. to "become anxious and panic because [he] was fearful the sun was falling from the sky;" (4) repeated threats to jump from moving vehicles, including an incident on the highway where he also "threatened to grab the steering wheel and crash the car;" (5) "physically aggressive" behaviors that made Easter "ready to call 911" or leave the house "out of fear ... in hopes that B.E. would calm down;" (6) running away; and (7) threats of self-harm and suicide. (Dkt. No. 27, ¶ 22).

In May 2012, a doctor diagnosed B.E. with "conduct disorder; mixed mood and anxiety disorder; a learning disability in language, reading, memory, and sequencing; and antisocial personality disorder." (Id. at ¶ 23; Dkt. No. 27–4, p. 4). Despite attempts to utilize "comprehensive, multifaceted out-patient treatment ..., B.E. had increasing problems with anger, mood swings, [ ] unpredictable behavior, declining academic performance, and learning disabilities." (Dkt. No. 27, ¶ 24; Dkt. No. 27–3, p. 3). Consequently, B.E.'s parents consulted with an educational specialist "to help find a residential treatment facility that would meet B.E.'s needs." (Dkt. No. 27, ¶ 25; Dkt. No. 27–5, p. 2). In October 2012, following consultation with other specialists including B.E.'s therapist, the consultant "developed a treatment plan for B.E. taking into consideration [his] diagnoses and other evident challenges, including a mood disorder, anxiety, adoption issues, racial-identity developmental issues, gender-orientation issues, anger management, and learning disabilities." (Dkt. No. 27, ¶ 27; Dkt. No. 27–5, pp. 2–3). According to the plan, that "there were no facili-

ties in close proximity that met B.E.'s complex needs" and recommended a "short-term intensive program that would be followed by a longer-term residential program." (Dkt. No. 27, ¶¶ 28–29; Dkt. No. 27–5, p. 3).

For the short-term program, B.E. entered the Second Nature Wilderness Program, "a licensed adolescent treatment program," in November 2012. (Dkt. No. 27, ¶ 30; Dkt. No. 27–6, p. 2). A doctor who worked with B.E. during the program recommended that B.E. "be followed closely by a child and adolescent psychiatrist as medications may continue to be an important part of [his] ongoing treatment" and indicated a belief that B.E. "would certainly do best in a residential treatment setting that can address all of [his] issues at once." (Dkt. No. 27, ¶ 31; Dkt. No. 27–7, p. 19) (internal quotation marks omitted). "On discharge from [the program] in February 2013, B.E. had diagnoses of pervasive development disorder not otherwise specified (NOS), depressive disorder NOS, reading disorder, disruptive behavior disorder NOS, and parent/child relational problems." (Dkt. No. 27, ¶ 32; Dkt. No. 27–6, p. 2). A doctor from the program stated in B.E.'s "Discharge Summary" that a return to B.E.'s home environment "would most certainly result in significant regression and a return to [his] previous level of functioning." (Dkt. No. 27, ¶ 33; Dkt. No. 17–6, p. 4).

On February 5, 2013, B.E. was admitted to Maple Lake Academy ("Maple Lake") in Utah (Dkt. No. 27, ¶¶ 35–36; Dkt. No. 27–8, p. 2), a facility licensed by the State "to provide residential treatment." (Dkt. No.

45–5). Patti Hollenbeck–Dial, one of its founders and owners who has "a doctorate in Marriage and Family Therapy" and has "specialized in working as a therapist with adolescents," stated in an affidavit that Maple Lake "provides 24–hour continuous, individually-planned residential treatment including daily clinical assessment, a structured daily therapeutic program that provides a minimum of 20 hours of therapy per week, daily medication management, 24–hour-per-day on-site supervision, a full-time nurse, a part-time child-adolescent psychiatrist, and discharge planning." (Dkt. No. 45–4, ¶¶ 1, 6). Hollenbeck–Dial also stated that "[p]rograms such as the one offered by Maple Lake to children like B.E. are a critical intermediate level of care between inpatient and outpatient treatment of mental, emotional, and behavioral conditions" and that "without an intermediate level of care and constant supervision, children with conditions such as those B.E. had in 2014 are likely to have worsening psychiatric, emotional, and cognitive problems." (*Id.* at ¶¶ 11–12). B.E.'s treatments at Maple Lake included "weekly individual therapy, weekly family therapy, daily group therapy, full participation in a residential program, participation in daily chores and exercise, as well as educational instruction." (Dkt. No. 27, ¶ 38; Dkt. No. 27–8, pp. 3–7). B.E. remained at Maple Lake through most of 2014, before admission to another facility in the end of that year.[4]

**B. The Cayuga Medical Center Health Plan**

"Cayuga Medical Center at Ithaca Prepaid Health Plan [ ('Plan') ] is a self-funded

---

**4.** Plaintiffs further allege in their Statement of Material Facts that in late 2014, "B.E.'s condition deteriorated again" and he "went back to a mental health residential wilderness program," where he remained through February 2015. (Dkt. No. 43–3, ¶¶ 72–73). In March 2015, after B.E.'s condition improved, he transferred to Brehm Preparatory School. According to Plaintiff, B.E's condition deteriorated there, and in April 2015, he "attempted suicide." (Dkt. No. 43–3, ¶¶ 73, 76–77). Subsequently, B.E. entered "Logan River Academy in Utah, a residential mental health treatment program." (Dkt. No. 43–3, ¶ 79).

employer-provided welfare benefit plan," for which Cayuga Medical Center at Ithaca ("CMC") "is the Plan Sponsor, Plan Administrator and a named fiduciary." (Dkt. No. 43–3, ¶ 1–2; Dkt. No. 47–1, ¶ 1–2; Dkt. No. 48–1, ¶¶ 1–2). Under the terms of Defendants' Administrative Services Contract ("ASC"), Excellus Health Plan, Inc. ("Excellus"), a licensee of the BlueCross Blue Shield Association, is "the Plan's third-party claims administrator," which "processes claims and determines benefits" for the Plan. (Dkt. No. 43–3, ¶ 3–4; Dkt. No. 47–1, ¶¶ 3–4; Dkt. No. 48–1, ¶¶ 3–4; Dkt. No. 48–3, p. 3). The ASC further provides that CMC "shall serve as the appropriate 'named fiduciary,' as defined by ERISA, for the purpose of reviewing and making decisions on claims denials." (Dkt. No. 43–4, ¶ 5.11(c)). Plaintiff Easter is a Plan participant and has been since January 1, 2013. (Dkt. No. 43–3, ¶ 5; Dkt. No. 34, ¶ 8; Dkt. No. 48, ¶ 5). Through Easter, B.E. was a beneficiary of the Plan during the periods of treatment for which Plaintiffs seek benefits. (Dkt. No. 43–3, ¶ 6; Dkt. No. 47–1, ¶ 6; Dkt. No. 48–1, ¶ 6).

### 1) Claims Procedures

The "Plan Document," in which the Plan is memorialized, provides that CMC is responsible for "establish[ing] and maintain[ing] claims procedures in accordance with ERISA." (Dkt. No. 42–2, ¶ 5). To that end, CMC executed the ASC, under which Excellus has authority to process claims by Plan participants and "make[ ] the initial claims determination." (Dkt. No. 45–1, ¶ 7; Dkt. No. 42–14, ¶ 7; Dkt. No. 43–4, ¶ 5.11). If Excellus denies a claim, the claimant "may file an initial appeal with Excellus," and if Excellus upholds the denial, the claimant may appeal to CMC, "which will then render a final determination." (Dkt. No. 45–1, ¶ 9; Dkt. No. 42–14, ¶¶ 9–10; Dkt. No. 43–4, ¶ 5.11).

To obtain benefits for medical services, a claimant must complete and submit to Excellus a "medical benefits subscriber claim form." (Dkt. No. 41–13, p. 2). Additionally, the claim form instructs claimants to submit:

ITEMIZED BILL(S) FOR SERVICES OR SUPPLIES **MUST BE SUBMITTED** WITH THIS FORM IN ORDER FOR REIMBURSEMENT TO BE CONSIDERED. THE ITEMIZED BILL MUST *CLEARLY* INDICATE **ALL OF THE FOLLOWING**: . . .

- NAME AND ADDRESS OF THE PROVIDER OF SERVICE ON THEIR OFFICE LETTERHEAD, INCLUDING PROVIDER ID NUMBER AND CREDENTIALS

- DATE FOR **EACH** SERVICE RENDERED

- DESCRIPTION AND/OR VALID PROCEDURE CODE FOR **EACH** SERVICE RENDERED

- CHARGE FOR **EACH** SERVICE RENDERED

- DESCRIPTION OF ILLNESS/INJURY AND/OR VALID DIAGNOSIS CODE FOR **EACH** SERVICE RENDERED

(*See, e.g.*, Dkt. No. 41–23, p. 7; Dkt. No. 41–13, p. 2) (internal numbering omitted, all emphasis in original). In cases where a claimant has omitted necessary information, the PPO Member Contract ("PPO Contract") establishes the Excellus procedure for requesting additional information. It provides:

If we have all information necessary to make a determination regarding a retrospective claim, we will make a determination and provide notice to you and your provider within 30 calendar days of receipt of the claim. If we need additional information, we will request it within 30 calendar days. You or your provider

will then have 45 calendar days to provide the information. We will make a determination and provide notice to you and your provider within 15 calendar days of the earlier of our receipt of the information or the end of the 45-day time period.

(Dkt. No. 43-4, p. 32). According to the ASC, Excellus is empowered to determine whether a claimant's treatment is medically necessary and whether the Plan documents provide for coverage. (*Id.* at p. 15; Dkt. No. 41-6, p. 41).

### 2) Relevant Coverage Provisions

The PPO Contract, which contains "a detailed description of the health coverage provided by the Plan, as well as the claims and appeal process" states that Excellus "will not provide coverage for hospitalization that is for mental health care, coverage for care in a licensed night or day care program for mental health care, or coverage for care in a residential treatment facility." (Dkt. No. 42-4, p. 11; Dkt. No. 43-3, ¶ 109; Dkt. No. 47-1, ¶ 109; Dkt. No. 48-1, ¶ 109). However, the appended "Rider for Mental Health Care," amends that provision and notes available coverage "for Medically Necessary diagnosis and treatment of Mental Illnesses." (Dkt. No. 42-4, p. 11; Dkt. No. 47-4, p. 3). It states:

When your Contract, Certificate or Group Health Plan currently covers 30 days of inpatient mental health care in a Calendar Year, or does not provide coverage for at least 30 days of inpatient mental health care in a Calendar Year, we will instead provide benefits for up to 30 days of active treatment in a Calendar Year in a hospital as defined by subdivision ten of section 1.03 of the New York Mental Hygiene Law.[5]

(Dkt. No. 47-4, p. 3).

### C. Plaintiffs' Interactions with Defendants

The causes of action in this case arise from Plaintiffs' attempts to obtain benefits for B.E.'s time at Maple Lake from January 2014 through October 2014 (Dkt. No. 45-1, ¶ 10) and communications between and among Plaintiffs, Excellus, and the CMC Defendants.

### 1) Requests for Plan Information

In 2013, Easter sought information about what coverage was available for her son under the Plan. "As early as February 12, 2013," Plaintiff Easter contacted Bill Toth, CMC's Benefits Manager, and provided "some of B.E.'s diagnoses and treatment information" as part of a request for information on the Plan's mental health

---

**5.** Section 1.03 defines a hospital as

the in-patient services of a psychiatric center under the jurisdiction of the office of mental health or other psychiatric in-patient facility in the department, a psychiatric in-patient facility maintained by a political subdivision of the state for the care or treatment of the mentally ill, a ward, wing, unit or other part of a hospital, as defined in article twenty-eight of the public health law, operated as a part of such hospital for the purpose of providing services for the mentally ill pursuant to an operating certificate issued by the commissioner of mental health, a comprehensive psychiatric emergency program which has been issued an operating certificate by such commissioner, or other facility providing in-patient care or treatment of the mentally ill which has been issued an operating certificate by such commissioner.

N.Y. Mental Hyg. Law § 1.03(10). Notably, the New York Mental Hygiene statute defines "[r]esidential treatment facility for children and youth" as a "sub-class of the class of facilities defined to be 'hospitals' in subdivision ten;" however, the definition of such facilities are limited to those "which provide active treatment under the direction of a physician." *Id.* at § 1.03(33). The record does not indicate that Maple Lake is under such direction.

coverage.[6] (Dkt. No. 43–3, ¶¶ 9–10; Dkt. No. 48–1, ¶¶ 9–10; Dkt. No. 43–5, pp. 7–9). In email correspondence with Toth, Easter sought information on "what, if any, coverage [B.E.] would get" under the Plan. (Dkt. No. 43–5 pp. 7–9). On March 15, 2013, Easter emailed Toth to ask for "a copy of CMC's insurance policy" so that she could "make an informed decision" about whether to place B.E. under her coverage. (Dkt. 43–5, p. 23). On March 21, CMC sent Plaintiffs' attorney "the Excellus Blue PPO health insurance spreadsheet," and on April 8, the attorney replied that she needed the "Plan Document" and not "the SPD[7] or a summary of benefits." (*Id.* at p. 36).

On May 14, 2013, Plaintiffs' attorney contacted CMC via email, noting that she had spoken with Toth via telephone about the request for documents and had yet to receive what she needed. (*Id.* at p. 39). She continued:

> I also discussed this request by phone with [Toth], and stated that I needed to evaluate eligibility and coordination of benefits provisions, thus the SBC[8] would not suffice. While the summary plan description could possibly meet our needs if it is detailed and in compliance with ERISA, my experience with insured plans is that they typically do not have such SPDs, thus you will likely need to send me the certificate of insurance or whatever serves as your full plan document. Please provide that to me as soon as possible. . . .

> I'm sure you are aware that if this is a plan governed by ERISA that you are required to provide a plan or SPD to the participant or her representative within 30 days of a written request. . . . We are well past the 30 days so please provide this to me as soon as possible.

(*Id.*). Toth responded on May 20, 2013, "enclosing copies of the following documents used in the administration of the Health Plan: Plan Document; Summary Plan Description; and Summary of Benefits and Coverage." (Dkt. No. 45–1, ¶ 46).

Plaintiffs' attorney emailed Toth again on October 9, 2013, writing, "Last May you were kind enough to send me an SPD and plan document for the CMC plan for your employee, Ms. Eastman [sic]." (Dkt. No. 43–5, p. 40). The email goes on to ask "if there will be a difference in benefits related to mental health care" for 2014. (*Id.*). Toth replied that "[t]he current plan . . . will be continued in 2014 and substantially unchanged." (*Id.* at p. 41).

On or about March 26, 2014, Easter requested "a list of [insurance] documents."[9] (Dkt. No. 43–3, ¶ 104; Dkt. No. 47–1, ¶ 104; Dkt. No. 48–1, ¶ 104). On April 2, 2014, CMC provided a "Summary of Benefits and Coverage" and stated that there were "no significant changes" to benefits from 2013. (Dkt. No. 41–21, p. 14). Plaintiffs did not receive the PPO Contract, which "contains detailed coverage information for mental health benefits," or the related "Custom PPO Grid" until discovery in this litigation. (Dkt. No. 43–3,

---

**6.** Plaintiffs characterize this initial contact with Toth as "part of a request for complete mental health coverage information under the Plan." (Dkt. No. 43–3, ¶ 10). Conversely, the CMC Defendants argue that Plaintiffs did not request complete information, but rather asked "[g]iven the diagnostic info which follows, would the boys [sic] treatment in a residential treatment facility be covered in

our Plan?" (Dkt. No. 48–1, ¶ 10) (alterations in original).

**7.** "SPD" refers to the "Summary Plan Description." (Dkt. No. 41–23, p. 16).

**8.** "SBC" refers to the "Summary of Benefits and Coverage." (Dkt. No. 43–9, p. 21).

**9.** The list is not found in the record.

¶¶ 107–11; Dkt. No. 48–1, ¶¶ 107–11; Dkt. No. 47–1, ¶¶ 107–11).

### 2) Claims Submissions

Plaintiffs switched to the Plan, and B.E. became covered under it for the year 2014. (Dkt. No. 45–1, ¶¶ 2–3; Dkt. No. 46–1, ¶ 21). Seeking information about how to file a benefits claim for B.E.'s treatment at Maple Lake, Plaintiffs contacted Toth on February 24, 2014, stating:

> The claim form ... does not have a place to enter diagnosis codes, etc, and states only that the provider's invoice be attached. Because of the way [Maple Lake] does its residential treatment billing, the invoice is not a traditional medical form with treatment codes similar to one from a medical doctor's office. Is there another type of claim form for this Excellus plan for mental health or for medical claims where we can provide the diagnosis codes?

(Dkt. No 43–5, pp. 46–50). Toth, after consultation with "the Account Manager at Excellus," replied with guidance the next day:

> The invoice from the provider should be attached to the claim form. If you have separate correspondence or a Dr.'s office notes indicating diagnosis codes, they can also be attached to the claim form. Alternatively, if the diagnosis codes were provided verbally, you can attach a written explanation referencing the diagnosis codes. Most providers do an intake evaluation and [BlueCross BlueShield] may contact the residential provider for a copy of the intake evaluation if they need further documentation for the claim.

(Dkt. No. 43–3, ¶ 19; Dkt. No. 43–5, pp. 47–48). Plaintiffs' attorney replied to Toth's email that day, thanking him and noting that it was "great information." (Dkt. No. 43–5, p. 47).

On or about February 27, 2014, Plaintiffs submitted claims for reimbursement to Excellus for B.E.'s January and February 2014 services at Maple Lake. (Dkt. No. 45–1, ¶ 12). Plaintiffs submitted the "medical benefits subscriber claim form," two invoices from Maple Lake [10]—one dated January 1, 2014 and the other February 1, 2014—and a document listing the names and license numbers of a psychiatrist and therapists under Maple Lake's masthead. (Dkt. No. 43–6, pp. 2–7). Plaintiffs also submitted a copy of a December 2013 email from a Maple Lake therapist that listed ICD–9 diagnosis codes for bipolar disorder, mild cognitive impairment, developmental dyslexia, "[o]ther specific developmental learning difficulties," and "[f]amily disruption due to parent-child estrangement," and CPT–4 treatment codes for several therapies.[11] (*Id.*) The email did not, however, specify when the therapies were conducted or who provided the services. (*Id.*). Instead, it noted that B.E. "normally" received individual and family psychotherapy on Monday and Wednesday, respectively, and participated in group therapy "3x a week Monday, Wednesday, & Thursday." (*Id.*). Although the email indicated that B.E. received "Evaluation and Management Psychiatry," it did not specify the time or frequency of this service. (*Id.*). Finally, the email states that the charge for each service is listed in an attached document; however, that document is not in the record and there is no indication that it was included in the claims submissions. (*Id.*). The last docu-

---

**10.** The invoices listed charges for "Clinical Fees," "Education," and "Room & Board." (Dkt. No. 43–6, p. 4).

**11.** CPT–4 and ICD–9 codes are standard codes that refer, respectively, to particular medical treatments and diagnoses.

ment Plaintiffs included were handwritten notes labeled "Drinkwater 12/10/13" and appear to include procedure codes. (*Id.*).

In a March 4, 2014 form letter, Excellus responded to Plaintiffs' claim for reimbursement for B.E.'s January and February 2014 residence at Maple Lake, stating, "We were unable to process the enclosed claim for payment" because (1) "[a] valid procedure code and/or detailed description of service is missing or invalid" for "Procedures, Services or Supplies" and "Diagnosis or Nature of Illness or Injury" and (2) they were "unable to identify the patient as an active member." (Dkt. No. 43–7, p. 41). Plaintiffs "submitted the Excellus ID number for B.E." but "[b]etween March 30, 2014 and May 8, 2014 Excellus neither decided the claims submitted February 28th nor contacted Plaintiff[s] to request additional information."[12] (Dkt. No. 43–3, ¶¶ 23–25; Dkt. No. 47–1, ¶¶ 23–25). Plaintiffs "never submitted any additional information" to support their February 2014 claims submission. (Dkt. No. 45–1, p. 7; Dkt. No. 42–14, ¶ 33).

Plaintiffs, through counsel, telephoned Excellus on May 8, 2014 "to request the status of the claims" and were advised that the Utah "local plan" was making a decision "because services were rendered out of the area." (Dkt. No. 43–7, pp. 7–8). The Excellus representative advised Plaintiffs to "give it a couple weeks" before checking in again. (*Id.*).

On or around May 13, 2014, Plaintiffs submitted claims for reimbursement for B.E.'s March, April, and May 2014 services at Maple Lake.[13] (Dkt. No. 43–3, ¶ 29; Dkt. No. 41–15, p. 2). Plaintiffs' attorney included a cover letter in this submission, but it otherwise matched the prior submission in that it included identical supporting documentation. (*See* Dkt. No. 41–15; Dkt. No. 43–6). Plaintiffs allege that they received no response from Excellus with respect to their March, April, and May 2014 claims; indeed, there is no response in the record. (Dkt. No. 43–3, ¶ 45). Excellus asserts that it responded to these claims. According to the declaration of an Excellus "claims project manager," Excellus "returned [the] claim with notice of what was wrong with it." (Dkt. No. 42–1, ¶ 17). The claims manager explains that there is no response in the record because Excellus "does not save a copy of its claim return notification letters after sending them to the claimant." (Dkt. No. 47–1, ¶ 45; Dkt. No. 42–1, ¶¶ 17–18, n.4).

Plaintiffs telephoned Excellus again on May 28, 2014. (Dkt. No. 61; Dkt. No. 43–3, ¶¶ 31–32). During this call, Plaintiffs and an Excellus representative discussed issuance of a denial letter so that Plaintiffs could appeal. (Dkt. No. 45–1, ¶¶ 65–66; Dkt. No. 46–1, ¶¶ 53–55; Dkt. No. 50–1, ¶ 65; Dkt. No. 51–2, ¶¶ 53–55; Dkt. No. 61). The Excellus customer service management system contains internal notes reflecting that, during the call, Plaintiffs "request[ed] something in writing such as a denial so they can move forward and appeal if possible" and shows the internal

---

**12.** Excellus communicated with Plaintiffs during this time period about a separate issue; it was seeking B.E.'s authorization (as required by HIPPA) to share his health information with Plaintiffs' attorneys. (Dkt. No. 43–7, pp. 2, 4–5). That issue was resolved, (*see* Dkt. No. 27, ¶¶ 52–53; Dkt. No. 33, ¶¶ 52–53; Dkt. No. 34, ¶¶ 52–53) and does not impact the Court's ruling.

**13.** The Defendants identify this claims submission as relating to "services Maple Lake provided B.E. in February, March and May 2014." (Dkt. No. 45–1, ¶ 20; Dkt. No. 46–1, ¶ 35). However, the submission's cover letter indicates that it pertains to services provided from "March 1, 2014 through May 31, 2014." (Dkt. No. 41–15, p. 2).

process of seeking an answer.[14] (Dkt. No. 61; Dkt. No. 43–3, ¶¶ 31–32). Though the Defendants argue that Plaintiffs knew generally that Excellus needed itemized information, it is undisputed that Plaintiffs never received a response from Excellus regarding a written denial or an appeal for any of their benefits claims. (Dkt. No. 43–3, ¶¶ 31–33; Dkt. No. 47–1, ¶¶ 31–33; Dkt. No. 48–1, ¶¶ 31–33; Dkt. No. 61).[15]

On June 25, 2014, Plaintiffs submitted "invoices for mental health services provided in June and July 2014." (Dkt. No. 43–3, ¶ 34; Dkt. No. 47–1, ¶ 34; Dkt. No. 48–1, 34; Dkt. No. 41–17). The supporting documentation contained no more information than that which Plaintiffs had previously submitted. (Dkt. No. 41–17). Plaintiffs then received a June 30, 2014 letter from Excellus, which does not indicate the specific claim or claims to which it refers. (Dkt. No. 43–7, p. 42). It states in its entirety:

June 30, 2014

Subscriber ID: 200767140

Dear Member:

Your claim is being returned for the following reason(s):

Need an itemized statement showing, To and From dates of service are missing from itemized statement.

Please resubmit with the requested information.

Thank you.

Claims Department

Kari R

(*Id.*).

On August 20, 2014, Plaintiffs resubmitted the July claims and added a claim for reimbursement for August 2014 services. (Dkt. No. 43–6, pp. 22–27). Again, they provided the same supporting documentation as in prior submissions, along with the Excellus form and the Maple Lake invoices. (*Id.*). On October 2, 2014, they submitted claims for services provided in September and October 2014 and likewise provided the same supporting documentation. (*Id.* at pp. 28–33).[16]

Defendants argue that each of Plaintiffs' claims for benefits omitted the following required information: "an itemization of professional services rendered to B.E.; the dates Maple Lake rendered each service; the charges for each service rendered; the procedure code(s) for each service rendered; the names and credentials of the providers rendering the services; and the specific treatment provided to B.E." (Dkt. No. 41–23, p. 8; Dkt. No. 42–15, pp. 10–13) (internal numbering omitted). Excellus argues that without the missing information, they cannot process the claims and cannot determine "whether any part of the services at issue are 'covered services' under the Plan, [whether] the provider was qualified to render the services, [whether] the services were medically necessary, [wheth-

---

**14.** Excellus' notes for that date also state that "the cpt codes do not have charge amts along with it and bcbs of utah [sic] can not [sic] key in [the] claim" and that without an "itemized bill from the provider" and "dos and what codes were billed on what days," Excellus could not issue a written denial letter. (Dkt. No. 61). After text reading "per legal:" the notes state that the "claim cannot be keyed by any Plan because the member did not provide the dates of services." (*Id.*).

**15.** The notes include entries stating, "[Y]ou can put the response in writing and send it to the attorney along with a copy of the claim form as reference," and later, "[N]o phone number or addres [sic] slisted [sic] from attorney—if she calls back please let meknow [sic] as i [sic] have aletter [sic] generated i [sic] can fax or mail to her." (Dkt. No. 61, p. 3).

**16.** After October 2014, Plaintiffs submitted additional claims; (Dkt. No. 43–6, pp. 34–75) however, the only claims at issue in this litigation are those covering services provided from January 2014 through October 2014. (Dkt. No. 45–1, ¶ 10).

er] the services were subject to day or visit limitations, the provider's charges for each service, and the amount of the allowable expense." (Dkt. No. 42–15, p. 13). Plaintiffs respond that they "submitted a claim form with all the information (and more) that was requested by ... Excellus and Bill Toth at CMC and the Plan." (Dkt. No. 53, p. 5).

## III. APPLICABLE LEGAL STANDARDS

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir.1995) (internal quotation marks and citations omitted)). When ruling on a summary judgment motion, "the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

### B. ERISA

 "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Plans must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by

the participant." 29 U.S.C. § 1133(1). Further, the Plan procedures must "afford a reasonable opportunity for a full and fair review" of adverse claim determinations. 29 U.S.C. § 1133(2). Full and fair review "requires that administrators follow proper procedural protocols in how they review claims, how much weight they assign different types of records, and how they reach decisions." *Martucci v. Hartford Life Ins. Co.*, 863 F.Supp.2d 269, 274 (S.D.N.Y. 2012) (citing *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 86–87 (2d Cir. 2009)). ERISA also provides a Plan beneficiary with a right to judicial review of a benefits termination. 29 U.S.C. § 1132(a)(1)(B). A claimant bears the burden of proving that she is eligible for disability benefits. *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 488 (2d Cir. 2013) (citing *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 765 (2d Cir. 2002)).

### C. Standard of Review

■ "ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co.*, 489 U.S. at 109, 109 S.Ct. 948. Rather, the Supreme Court has held that a Plan Administrator's decision to deny benefits is reviewed *de novo*, unless the Plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. 948. When the Plan gives the administrator such discretionary authority, judicial review of the adequacy of a claim decision is limited to determining whether the decision was "arbitrary and capricious" or "an abuse of discretion." *Id.* However, the Second Circuit has noted that even where a plan grants such discretionary authority, Department of Labor regulations "impose[ ] minimum requirements for benefit claims procedures, and ... clarif[y] that,

when a plan fails to comply with those minimum requirements, the plan's decision denying a claim should not be entitled to deference in court." *Halo v. Yale Health Plan*, 819 F.3d 42, 51 (2d Cir. 2016); *see also* 65 Fed. Reg. at 70,255 ("The Department's intentions in including this provision in the proposal were to clarify that the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference."). The *Halo* court held that:

> When denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503–1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless.

*Halo*, 819 F.3d at 58.

### IV. DISCUSSION

Plaintiffs assert three causes of action: (1) under ERISA § 502(a)(1)(B) to recover full benefits due; (2) under ERISA § 502(a)(3) to remedy alleged breaches of fiduciary duty and claims procedure; and (3) under ERISA § 502(a)(1)(A) for the Plan Administrator's alleged failure to supply plan information within 30 days. As a preliminary matter, the Court considers whether Plaintiffs have exhausted their administrative remedies.

### A. Exhaustion of Administrative Remedies

■ Defendants argue that they are entitled to summary judgment because Plaintiffs "failed to exhaust available adminis-

trative remedies and cannot show that an appeal would have been futile." (Dkt. No. 41–23, p. 9; Dkt. No. 42–15, p. 14). In ERISA cases, "[a] failure to exhaust administrative remedies provides grounds for dismissal or summary judgment in favor of the opposing party." *Zarringhalam v. United Food & Commercial Workers Int'l Union Local 1500*, 906 F.Supp.2d 140, 152 (E.D.N.Y. 2012); *see also Klotz v. Xerox Corp.*, 332 Fed.Appx. 668, 669 (2d Cir. 2009).

### 1) Relevant Law

The Second Circuit has "recognized the firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases." *Halo*, 819 F.3d at 55 (quoting *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993)). However, the Circuit has also "explained that there is a balance to be struck" and that "ERISA requires *both* that employee benefit plans have reasonable claims procedures in place, and that plan participants avail themselves of these procedures before turning to litigation." *Id.* at 55–56 (second quotation from *Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 219 (2d Cir. 2006)). Essential to the *Halo* decision was an ERISA regulatory provision, which notes:

> In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure

that would yield a decision on the merits of the claim.

29 C.F.R. § 2560.503–1(1). Construing this provision, the *Halo* court rejected the "substantial compliance" standard that courts had frequently applied on the basis that it was "flatly inconsistent" with the ERISA regulations promulgated in 2000. *Halo*, 819 F.3d at 56.[17]

■ The ERISA regulatory framework provides "minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries" and obligates the plans to "establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations." 29 C.F.R. § 2560.503–1(a)–(b). One such minimum requirement for a reasonable claims procedure is:

> In the case of a post-service claim, the plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the plan's adverse benefit determination within a reasonable period of time, but not later than 30 days after receipt of the claim. This period may be extended one time by the plan for up to 15 days, provided that the plan administrator both determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 30–day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision. If such an extension is necessary due to a failure of the claimant to submit the information

---

17. Though *Halo* addressed a plan's denial of a claim, the reasoning of the decision is plainly applicable to this case where it rejects the "substantial compliance" doctrine and favorably discusses "the logic ... that a claim is

subject to *de novo* review if it is 'deemed denied,' the effective equivalent of being deemed exhausted under the [current] regulation." *Halo*, 819 F.3d at 53–54.

necessary to decide the claim, the notice of extension shall specifically describe the required information, and the claimant shall be afforded at least 45 days from receipt of the notice within which to provide the specified information.[18] 29 C.F.R. § 2560.503–1(f)(2)(iii)(B). As the Ninth Circuit has stated and the Second Circuit has agreed, "In simple English, what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries." *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997); *Juliano v. HMO of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000); *see also Magee v. Metro. Life Ins. Co.*, 632 F.Supp.2d 308, 318–19 (S.D.N.Y. 2009) (quoting *Juliano* and noting that "ERISA requires an administrator to inform plan participants of the information it seeks and the criteria to be applied").

### 2) General Reasonableness of the Claims Process

As noted above, Plaintiffs allege that they received only two written replies from Excellus in response to submissions of benefits claims in February, May, June, August, and October 2014. Excellus asserts that it sent additional replies, but that there are no copies of these replies in the record because, as a general practice, it does not retain copies after sending them. (Dkt. No. 42–1, p. 7 nn. 2, 4). Of the two responses in the record, the first, dated March 4, 2014, noted that "a valid procedure code and/or detailed description of service" as well as a "valid diagnosis code and/or detailed description of illness" were "missing or invalid;" however, it omitted any mention of an itemized invoice. (Dkt. No. 43–7, p. 41). The second reply, dated June 30, 2014, noted that Excellus needed "To and From dates of service" on an "itemized statement;" however, it failed to specify which claim it referred to and did not request procedure or diagnosis codes.[19] (*Id.* at p. 42). It has adduced no evidence that the purported additional responses were consistent with each other or otherwise procedurally valid.

Plaintiffs fared no better in telephone communications with Excellus. When Plaintiffs' counsel's office called Excellus on May 8, 2014, the Excellus representative did not indicate that there were any deficiencies with Plaintiffs' benefits claims. (*Id.* at pp. 7–9). During a subsequent call on May 28, 2014, Plaintiffs requested "something in writing such as a denial" so they could pursue an appeal; however, Excellus never responded to this request. (Dkt. No. 43–3, ¶¶ 31–33; Dkt. No. 47–1, ¶¶ 31–33; Dkt. No. 48–1, ¶¶ 31–33; Dkt. No. 61).

These written and telephonic interactions do not constitute a "meaningful dialogue" like that which the ERISA regulations envision. Excellus' inconsistencies and failures to respond, particularly after

---

18. The regulations note that "[i]n the event that a period of time is extended as permitted pursuant to … this section due to a claimant's failure to submit information necessary to decide a claim, the period for making the benefit determination shall be tolled from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information." 29 C.F.R. § 2560.503–1(f)(4).

19. The March 4 response bore the heading "Claim Return Notification," directed questions to "Customer Service at the telephone number listed on your subscriber identification card," and listed descriptions of the missing information with reference to fields in the standard claim form. (Dkt. No. 43–7, p. 43). The June 30 response contained no identifying heading, described an unspecified submission's deficiencies, and failed to inform Plaintiffs where to direct questions. (Dkt. No. 43–7, p. 44).

Plaintiffs sought to carry forward their claims to the appeals process, are significant procedural deficiencies that caused legitimate harm to Plaintiffs, who were left to believe that they could not appeal to Excellus and faced significant economic hardship as they paid for B.E.'s treatment out-of-pocket.[20] These problems, along with Excellus' failure to keep records of claim return notifications, support a finding that it did not "maintain reasonable procedures governing the filing of benefit claims" as required.

### 3) Requirements under 29 C.F.R. § 2560.503–1(f)—Notice of Extension

Additionally, Excellus failed to meet the requirements of 29 C.F.R. § 2560.503–1(f). As noted above, where a group health plan claimant for post-service benefits submits a claim that lacks necessary information, the plan must respond within 30 days with either an adverse benefit determination or a "notice of extension" that (1) "notifies the claimant . . . of the circumstances requiring the extension . . . and [ (2) ] the date by which the plan expects to render a decision," (3) "specifically describes the required information," and (4) affords the claimant "at least 45 days from receipt of the notice within which to provide the specified information." [21] *See* 29 C.F.R. § 2560.503–1(f)(2)(iii)(B). After providing a notice of extension, the requirement to issue an adverse benefit determination is tolled until "claimant responds to the request for additional information." 29 C.F.R. § 2560.503–1(f)(4). An interpretative FAQs page on the Department of Labor's website notes that the tolling provision has broader meaning, such that

> [t]he time period for making the decision is suspended (tolled) from the date of the notification to the claimant to the earlier of:
> 
> ● The date on which a response from the claimant is received by the plan[, or]
> 
> ● The date established by the plan for the furnishing of the requested information (at least 45 days)[.]

Dep't of Labor, Benefit Claims Procedure Regulation FAQs, (Nov. 14, 2016, 11:11am), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/benefit-claims-procedure-regulation, C–3. Here, Excellus did not issue a timely adverse benefit determination and also failed on at least two occasions to meet the procedural requirements for its notices of extension.

**20.** The PPO Contract provides that Excellus' failure to issue a timely adverse benefit determination will itself constitute an "adverse determination subject to appeal." (Dkt. No. 41–6). However, as noted above, Plaintiffs did not receive the PPO Contract until discovery in this litigation, and none of Excellus' communications informed Plaintiffs of the timing requirements or their right to appeal.

**21.** The regulation does not indicate whether the notice of extension itself must contain language informing the claimant that he or she has at least 45 days to provide the information, or whether the plan can communicate that to the claimant through other means. The distinction is irrelevant in this case, because there is no evidence that Excellus informed Plaintiffs that they were required to provide the additional information within a certain amount of time. Although the PPO Contract states that a claimant must provide requested claim information within "45 calendar days," Defendants failed to provide the PPO Contract to Plaintiffs until after they commenced this action. Further, to the extent that it is unclear whether Plaintiffs' claims were all post-service claims or whether some were pre-service, the Court notes that that fact is not material to the matter at issue, because the pre-service claims require a more exacting response than post-service claims. Therefore, if Defendants failed to abide by the post-service requirements, they likewise failed to abide by the pre-service ones. *See* § 2560.503–1(f)(2)(iii)(A)–(B).

### a. Failure to Issue a Timely Adverse Benefit Determination

Even after Plaintiffs' May 28, 2014 phone call, Excellus never issued an adverse benefit determination for Plaintiffs' February claims submission. Consequently, Excellus violated subsection (f). An adverse benefit determination means any of the following:

A denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including any such denial, reduction, termination, or failure to provide or make payment that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan, and including, with respect to group health plans, a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit resulting from the application of any utilization review, as well as a failure to cover an item or service for which benefits are otherwise provided because it is determined to be experimental or investigational or not medically necessary or appropriate.

29 C.F.R. § 2560.503–1(m)(4). Under subsection (g), any adverse benefit determination must notify the claimant of the specific plan provision upon which the determination is based, the plan's review procedures, time limits, and other information. 29 C.F.R. § 2560.503–1(g). Plans are permitted to issue an adverse benefit determination denying claims "at any point in the administrative process on the basis that it does not have sufficient information." Benefit Claims Procedure Regulation FAQs, C–21. However, as discussed above, plans may also afford claimants additional time to submit information before issuing an adverse benefit determination, in accordance with subsection (f) of the regulations. Thus, a notification to a participant requesting additional information can, *but does not necessarily*, constitute an adverse benefit determination.[22]

Thus, while the ERISA regulatory scheme would allow Excellus to deny Plaintiffs' claims for lack of sufficient information, it requires Excellus to include information about the appeals process and comport with the formalities of subsection (g) when issuing such an adverse benefit determination. Excellus did not issue a denial, as required by the PPO Contract. (Dkt. No. 41–6, p. 42). Its responses lacked information about further administrative review, did not reference specific plan provisions that Plaintiffs violated, and did not make clear "in a manner calculated to be understood by the claimant" that it was issuing an initial denial. *See* 29 C.F.R. § 2560.503–1(g). In fact, Excellus' communications to Plaintiffs did not suggest that it had denied Plaintiffs' claims or terminated their benefits, but rather stated that it had not processed Plaintiffs' claims at all. (*See* Dkt. No. 43–7, pp. 41–42). Thus, on these facts, the Court finds that the Excellus responses in the record did not constitute adverse benefit determinations.[23]

---

22. The CMC Defendants cite *Zarringhalam* for the proposition that "a notification to a participant requesting additional information amounts to an adverse determination." (Dkt. No. 48, p. 9). In *Zarringhalam*, the court found that, under circumstances of that case, the defendant's request for more information and a signed subrogation agreement constituted an adverse benefit determination. *Zarringhalam*, 906 F.Supp.2d at 153–54. The court emphasized that the plan provided opportunities for appeal from the notices and appended "a description of the appeals process on the reverse side" of each notification to the plaintiff. *Id.* at 153. In contrast, here Excellus provided no such information in the notices it sent to Plaintiffs.

23. Even if the responses were adverse benefit determinations, they are deficient under 29 C.F.R. § 2560.503–1(g), which requires adverse determinations to, *inter alia*, "[r]efer[ ]

Plaintiffs' May 28, 2014 phone call to Excellus, in which they requested a written denial so that they "can move forward and appeal if possible" (Dkt. No. 61), constitutes a response to the prior Excellus communications, which had notified Plaintiffs that they needed to submit additional information. Thus, even if that notice was sufficient to toll the time limit within which Excellus needed to issue an adverse benefit determination in connection with the February claim for benefits,[24] that tolling ceased on May 28, 2014, giving Excellus 15 days to issue an adverse benefit determination. *See* 29 C.F.R. § 2560.503–1(f)(2)(iii)(B), (f)(4). Excellus failed to do so, thereby violating the ERISA regulations.

Excellus argues that the regulatory timing provisions do not apply, however, because Plaintiffs' failure to provide additional information "precluded Excellus from conducting an initial review of the claims and from making an initial determination." (Dkt. No. 47, p. 15). This argument is unavailing. The ERISA regulations state that adverse benefit determinations must be made "within a reasonable period of time" regardless of whether the claimant has submitted all necessary information. 29 C.F.R. § 2560.503–1(f)(2)(iii)(B), (f)(4). These provisions also permit plans to limit the amount of time afforded claimants to provide necessary information; *id.* therefore, it follows that plans may deny claims if claimants do not meet the time limita-

tion. The Department of Labor FAQs add further support to this interpretation, noting that "[t]he time for making an initial claims decision begins to run when the claim is filed in accordance with a plan's reasonable filing procedures, *regardless of whether the plan has all of the information necessary to decide the claim at the time of the filing*" and that, even when missing necessary information, "the plan may nevertheless have to make a decision on the claim before receiving such information." Benefit Claims Procedure Regulation FAQs, C–1–C–2 (emphasis added). Excellus has therefore violated the timing provisions in subsection (f).

### b. Requirements of a "Notice of Extension"

As stated, the parties dispute the number of responses Excellus issued in response to Plaintiffs' claims for benefits.[25] None of Excellus' written or telephonic communications in the record include "the date by which the plan expects to render a decision" or a "date established by the plan for the furnishing of the requested information." *See* 29 C.F.R. § 2560.503–1(f)(2)(iii)(B); Benefit Claims Procedure Regulation FAQs, C–3. Furthermore, Excellus has adduced no evidence that the purported additional responses contained such information. Thus, even construing the evidence in a light most favorable to the Defendants, Excellus has failed to abide by requirements for issuing a sufficient "notice of extension" under subsec-

---

to the specific plan provisions on which the determination is based" and "[a] description of the plan's review procedures and the time limits applicable to such procedures." Moreover, because as discussed *infra* at Part IV(A)(5), the undisputed evidence indicates that these omissions harmed Plaintiffs, Plaintiffs' administrative remedies would be deemed exhausted. *See Halo*, 819 F.3d at 60–61.

**24.** Excellus also violated the procedural requirements for such notice. *See infra* Part IV(A)(3)(b).

**25.** As noted above, Plaintiffs allege that they did not receive responses to each of their claims (and only two responses are in the record). Excellus has filed a sworn statement of its representative Sherry Hunt, a claims project manager, that it did respond each to each of Plaintiffs' claims. (Dkt. No. 42–1, p. 7 nn. 2, 4).

tion (f). *See Linder v. BYK–Chemie USA, Inc.*, 313 F.Supp.2d 88, 93 n.4 (D. Conn. 2004) ("Moreover, because the letter inviting Linder to provide additional information nowhere states that an extension of time was necessary, and nowhere provides a date by which the plan expected to render a decision, it does not meet the regulation's requirements for notice of an extension of time to process a claim.").

### 4) Excellus' Argument that the ERISA Regulations at Issue Do Not Apply

Excellus also argues that because it did not technically deny Plaintiffs' claims for benefits, ERISA § 503, which refers specifically to denials, and 29 C.F.R. § 2560.503–1, which "flows from" that statutory section, are inapplicable. (Dkt. No. 47, p. 16). Excellus cites *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 180 (7th Cir. 1994), for the proposition that absent a denial of a benefits claim, "plans are not require[d] to comply with the conditions under § 503 and related regulations." (Dkt. No. 47, p. 17). This argument is unavailing. The holding in *Tolle*, decided in 1994, was based upon a previous version of the ERISA regulations. Unlike the current codification, the 1994 regulations did not specify that they derived authority from *both* ERISA § 503 (referring specifically to notice and review "to any participant whose claim for benefits . . . has been denied") and ERISA § 505 (broadly authorizing the promulgation of regulations "necessary or appropriate to carry out the provisions of this title"). *Compare* 29 C.F.R. § 2560.503–1(a)(1) (1994) (not specifying its source of authority) *with* 29 C.F.R. § 2560.503–1(a)(1) (2016) (noting its promulgation "[i]n accordance with the authority of sections 503 and 505"); *see also* 29 U.S.C. §§ 1133, 1135.

Furthermore, the 1994 codification did not contain the provision now found at 29 C.F.R. § 2560.503–1(f)(2)(iii)(B), which specifically regulates plan procedures in cases where an extension of time to determine a claim is needed "due to a failure of the claimant to submit the information necessary." 29 C.F.R. § 2560.503–1 (1994). Applying this earlier version, the *Tolle* court reasoned that the plan at issue "was not required to comply with the procedural requirements of § 503 [in rejecting the claim]" because the plan had provided notice that it "could not process [the] claim because the claim form was not completed in all of its parts." *Tolle*, 23 F.3d at 180. Post–*Tolle* updates to the regulatory scheme plainly require additional notice procedures, which Defendants in this case have failed to meet. As a result, Excellus' argument that the regulations are inapplicable in this case must fail.

### 5) Conclusion

Construing the facts in the light most favorable to Defendants, resolving all ambiguities in their favor, and drawing all reasonable inferences against Plaintiffs, the Court finds that Defendants violated the procedural requirements of the ERISA regulations as promulgated at 29 C.F.R. § 2560.503–1. As noted above, the burden is on Defendants to show that these procedural failings were "inadvertent *and* harmless." *Halo*, 819 F.3d at 58. Here, however, the record shows that the procedural deficiencies left Plaintiffs believing that they could not pursue further administrative appeal. While it is true that Plaintiffs are not blameless in the miscommunications among the parties to this litigation, it is undisputed that Plaintiffs attempted to pursue administrative remedies following the Excellus responses to their February submission of benefits claims by requesting that Excellus issue a written decision so that they could appeal. Excellus, however, did not issue a decision, and because it did not provide Plaintiffs with information

regarding the appeals process, it delayed final adjudication of Plaintiffs' claims and prevented further development of the administrative record. Thus, Plaintiffs reasonably believed that their sole remaining option was to seek redress from the courts and, as a result, unquestionably suffered harm. The Court therefore finds that Plaintiffs have exhausted administrative remedies and that Defendants are not entitled to summary judgment on that ground. The Court turns to the issue of whether Plaintiffs may assert a claim to recover benefits against Excellus.

## B. ERISA § 502(a)(1)(B) Claims

ERISA § 502(a)(1)(B) permits civil actions by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Plaintiffs seek de novo review of their mental health claims and a judgment that they are entitled to reimbursement for mental health benefit costs incurred. (Dkt. No. 27, p. 14).

### 1) Plaintiffs' Claim to Recover Full Benefits Due as Against Excellus

Excellus argues that it is entitled to summary judgment with respect to the Plaintiffs' claim under § 502(a)(1)(B) because, as a claims administrator, it is not a proper defendant. The Second Circuit has stated held that "[i]n a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as such may be held liable." *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 509–10 (2d Cir. 2002); *see also Delprado v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 1:12–CV–00673, 2015 WL 1780883, at *38, 2015 U.S. Dist. LEXIS 51263 (N.D.N.Y. Apr. 20, 2015). However, in *New York State Psychiatric Ass'n v. UnitedHealth Group*, the Second Circuit held that "where the claims administrator has sole and absolute discretion to deny benefits and makes final and binding decisions as to appeals of those denials," it "is an appropriate defendant in a § 502(1)(B) action for benefits." 798 F.3d 125, 132 (2d Cir. 2015). The *New York State Psychiatric Ass'n* court noted that § 502(a)(1)(B) does not, "by is plain terms . . . preclude suits against claims administrators" and noted that "since Leonelli [v. Pennwalt Corp., 887 F.2d 1195 (2d Cir. 1989)], we have not held or even suggested that a claims administrator is an improper defendant under § 502(a)(1)(B)." *Id.* at 132–33.

■ Here, Excellus is a claims administrator but does not have sole and absolute discretion to deny benefits," and it does not make final and binding decisions as to appeals. Plan participants can appeal Excellus' determinations to CMC, which can then make a final determination on claims for benefits that binds Excellus. (Dkt. No. 45–1, ¶ 9; Dkt. No. 46–1, ¶¶ 9–11). The Second Circuit holding in *New York State Psychiatric Ass'n* did not address these facts, and prior to its holding, the long-standing rule in the Second Circuit was that only a plan administrator or fiduciary could be held liable under § 502(a)(1)(B).[26]

---

26. As the Second Circuit noted in *New York State Psychiatric Ass'n,* other circuits "have held that claims administrators may be sued as defendants under § 502(a)(1)(B)." 798 F.3d at 132; *see, e.g., Cyr v. Reliance Std. Life Ins. Co.,* 642 F.3d 1202, 1206 (9th Cir. 2011) (concluding "that potential defendants in actions brought under [§ 502](a)(1)(B) should not be limited to plans and plan administrators" and finding that the plan insurer that had also denied the request for benefits was a proper defendant); *Larson v. United Healthcare Ins. Co.,* 723 F.3d 905, 911 (7th Cir. 2013) (noting that "[i]n many cases the plan

*See Levi v. McGladrey LLP*, No. 12–CV–8787, 2016 WL 1322442, at *4–5, 2016 U.S. Dist. LEXIS 44617, at *12–13 (S.D.N.Y. Mar. 31, 2016) (citing *Crocco v. Xerox Corp.*, 137 F.3d 105, 107–08 (2d Cir. 1998); *Gates v. United Health Grp.*, No. 11 Civ. 3487, 2012 WL 2953050, at *10, 2012 U.S. Dist. LEXIS 100831, at *31 (S.D.N.Y. 2012) (noting that "discretion or control over certain administrative functions does not make a party a de-facto plan administrator" and that, as a result, "plaintiff cannot maintain her Section 502(a)(1)(B) claim against UHIC"). Since there is no governing precedent for holding a claims administrator with less than total control responsible, the Court finds that Excellus is not liable under Count I of the Second Amended Complaint, and that Count is therefore dismissed as against Excellus.

### 2) Judicial Review and the Administrative Record

For Plaintiffs' § 502(a)(1)(B) claim against the CMC Defendants, it remains for the Court to determine the standard of judicial review. Generally, when courts consider an ERISA claim alleging improper denial of benefits, "a de novo standard of review will apply to the plan administrator's determination, unless the plan grants authority to the administrator to use his or her discretion to construe the terms of the plan and determine eligibility for plan benefits." *Wilson v. Aetna Life Ins. Co.*, No. 8:15–CV–752, 2016 WL 5717370, at *5, 2016 U.S. Dist. LEXIS 135396, at *13 (N.D.N.Y. 2016) (citing *Firestone Tire and Rubber Co.*, 489 U.S. at 115, 109 S.Ct. 948). While the Plan grants CMC such discretionary authority, the extent to which Excellus exercises discretion is unclear.[27] Nevertheless, procedural deficiencies in the claims process mean that, under *Halo* and 29 C.F.R. § 2560.503–1(1), the Court must apply a de novo standard.[28]

### a. Evidence under Review

When conducting de novo review of administrative decisions on ERISA claims, "district courts typically limit their review to the administrative record before the plan at the time it denied the claim." *Halo*, 819 F.3d at 60. The Second Circuit, however, has recognized that "the decision whether to admit additional evidence is one which is discretionary with the district court, but which discretion ought not to be exercised in the absence of good cause." *Id.* (quoting *DeFelice v. Am. Int'l Life Assurance Co.*, 112 F.3d 61, 66–67 (2d Cir. 1997)). "[G]ood cause to admit additional evidence *may* exist if the plan's failure to comply with the claims-procedure regulation adversely affected the development of the administrative record." *Id.* (emphasis added).[29] "The decision whether to consid-

---

will be the right (and only proper) defendant when a participant or beneficiary seeks benefits owed under the terms of the plan" and that "it does not follow from this general rule that an ERISA claim for benefits may never be brought against an insurer").

**27.** *See infra* Part IV(C)(2).

**28.** Having concluded that Plaintiffs have exhausted their administrative remedies and are entitled to de novo review, the Court need not address Plaintiffs' arguments arising under the Patient Protection and Affordable Care Act. (Dkt. No. 43–9, pp. 12–14).

**29.** Plaintiffs argue that there is no administrative record in this case, claiming that "Excellus never decided Plaintiffs['] claims" and citing case law for the proposition that "the administrative record ... by definition consists only of those documents before the administrator that *determined* the claims." (Dkt. No. 46, p. 14 (quoting *Allison v. Unum Life Ins. Co.*, No. CV 04–0025, 2005 WL 1457636, at *9, 2005 U.S. Dist. LEXIS 3465, at *29 (E.D.N.Y. Feb. 11, 2005) (emphasis added by Plaintiffs in memoranda)). The Court finds this argument unavailing. Plaintiffs submitted certain documents to Excellus for its administrative review; those documents along with

er information outside the administrative record is a discretionary one even where there is 'good cause.' " *Locher v. UNUM Life Ins. Co. of Am.*, 389 F.3d 288, 295 (2d Cir. 2004) (citing *Critchlow v. First UNUM Life Ins. Co. of Am.*, 340 F.3d 130 n.2 (2d Cir. 2003) (withdrawn and vacated on reconsideration on other grounds, 378 F.3d 246 (2d Cir. 2004)).

■■■■ While the facts of this case might establish good cause to look beyond the administrative record, the Court, in its discretion, declines to do so. Although supplementing an administrative record may be appropriate under different facts, the situation here would essentially require the Court to create the administrative record *ab initio*. It is not the role of the district courts to serve as substitute claims administrators. *Novick v. Metro. Life Ins. Co.*, 914 F.Supp.2d 507, 528 (S.D.N.Y. 2012) (citing *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995)). Although Defendants' procedural violations hindered development of the administrative record, their failures are balanced against: (1) Plaintiffs' failure to provide the additional information that Excellus requested; (2) the absence of any suggestion that Defendants have a conflict of interest or would otherwise render a biased or unfair determination of Plaintiffs' claims if provided the requested information; (3) Defendants' relative expertise in creating an administrative record and determining medical necessity; and (4) the Court's interest in judicial economy.[30] Therefore, the Court will not look beyond

the administrative record upon its exercise of de novo review.

Here, the administrative record contains only the documentation that Excellus had before it when reviewing Plaintiffs' claims. That consists of all relevant documents describing rights and obligations under the Plan, Plaintiffs' claims submissions pertaining to Maple Lake, which included Maple Lake invoices, and records of communication among Plaintiffs, Excellus, and CMC.

**b. Application of Judicial Review**

■■■■ "When applying the de novo standard of review, the Court reviews 'all aspects of the denial of an ERISA claim.' " *McDonnell v. First Unum Life Ins. Co.*, No. 10–CV–8140, 2013 WL 3975941, at *11, 2013 U.S. Dist. LEXIS 110361, at *37–38 (S.D.N.Y. Aug. 5, 2013) (citing *Kinstler v. First Reliance Std. Life Ins. Co.*, 181 F.3d 243, 245 (2d Cir. 1999)). The Court gives no deference to the administrative interpretation of the plan documents or its conclusion regarding the merits of the claim, but rather "reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, ... entitle[ment] to benefits under the plan." *McDonnell*, 2013 WL 3975941, at *12, 2013 U.S. Dist. LEXIS 110361, at *39. As always at the summary judgment stage, a genuine issue of material fact would prevent the Court from awarding judgment as a matter of law.

Here, the ASC "expressly approves the terms and conditions set forth in the [PPO

---

Defendants' responses and notes constitute the administrative record.

**30.** In *Suozzo v. Bergreen*, a court chose "not to exercise its discretion to expand the administrative record" where certain evidence was not in the record because of the claimant's actions during the administrative process and where it "is not a case where the Court must

go beyond the record 'to ensure a comprehensive and impartial review of the case,' or where the 'fairness of the ERISA appeals process cannot be established using only the record before the administrator.' " No. 00–Civ.–9649, 2003 WL 22387083, at *5–6, 2003 U.S. Dist. LEXIS 18597, at *13, 16 (S.D.N.Y. Oct. 20, 2003) (quoting *DeFelice*, 112 F.3d at 66).

Contract]" and provides that "[b]enefits will be provided only if all of the terms and conditions set forth in [the PPO Contract] are satisfied." (Dkt. No. 43–4, ¶ 5.1(a)). One relevant condition is that the Plan "provide[s] coverage ... for the covered benefits described ... as long as the hospitalization, care, service, technology, test, treatment, drug, or supply (collectively, "Service") is Medically Necessary." (Dkt. No. 41–6, p. 10). The Claims Administrator (Excellus) "decide[s] whether care was Medically Necessary ... base[d] ... in part on a review of [ ] medical records ... [and] medical opinions." (*Id.* at p. 10). Services are Medically Necessary only if:

A. they are appropriate and consistent with the diagnosis and treatment of your medical condition;

B. they are required for the direct care and treatment or management of that condition;

C. if not provided, your condition would be adversely affected;

D. they are provided in accordance with community standards of good medical practice;

E. they are not primarily for the convenience of you, your family, the Professional Provider or another provider;

F. they are the most appropriate service and rendered in the most efficient and economical way and at the most economical level of care which can safely be provided to you; and

G. when you are an inpatient, your medical symptoms or conditions are such that diagnosis and treatment

cannot safely be provided to you in any other setting (e.g., outpatient, physician's office or at home).

(*Id.* at p. 11).

The administrative record does not provide a basis upon which the Court could determine whether B.E.'s treatment at Maple Lake was medically necessary. The absence of more detailed records would make the analysis little more than supposition. Furthermore, there is insufficient information in the administrative record to determine the extent to which B.E.'s treatment at Maple Lake was covered, if at all, under the Plan in 2014.[31] For these reasons, having reviewed the administrative record de novo, the Court finds that Plaintiffs' claims contain insufficient information to permit a benefits determination on the merits. The Court therefore does not grant Plaintiffs' or the CMC Defendants' motions for summary judgment with respect to this claim.

### 3) Remand

 Courts broadly agree that after review of an ERISA benefits determination, remand to a Plan Administrator or Claims Administrator is an available remedy. *See Shelby Cnty. Health Care Corp. v. Majestic Star Casino, LLC Grp. Health Benefit Plan*, 581 F.3d 355, 373 (6th Cir. 2009) ("Where a district court determines that the plan administrator erroneously denied benefits, a district court may either award benefits to the claimant or remand to the plan administrator.") (internal quotation omitted); *LeClair v. Liberty Life Assur. Co.*, No. 6:12–CV–6066, 2013 WL 3338685, at *3, 2013 U.S. Dist. LEXIS

---

**31.** Plaintiffs argue that even if the Plan did not provide coverage for B.E.'s treatment, the Court can find that such coverage existed through operation of mental health parity laws. (Dkt. No. 43–9, pp. 20–24; Dkt. No. 46, pp. 5, 15; Dkt. No. 53, pp. 9–13). This argument must fail because there are insufficient facts in the administrative record for the Court to know exactly what treatment B.E. received and whether he needed it. Without that information, the Court is unable to determine entitlement to benefits under either the Plan or the parity laws.

93049, at *7–8 (W.D.N.Y. Jul. 2, 2013) (supporting remand to a Plan Administrator and citing cases); *Viglietta v. Metro. Life Ins. Co.*, No. 04–CV–3874, 2005 WL 5253336, at *1, 2005 U.S. Dist. LEXIS 42925, at *1 (accepting magistrate recommendation to remand ERISA case "to the claims administrator for reconsideration"). District courts may remand even following de novo review of benefits claims. *Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311, 1327 (10th Cir. 2009) ("[U]nder *de novo* review, remand to the administrator is an available remedy but is not always the appropriate one."); *Quesinberry v. Life Ins. Co.*, 987 F.2d 1017, 1025 n.6 (4th Cir. 1993) (noting that, on de novo review, "remand to the plan administrator is [ ] available to the district court, where necessary" and that "the district court may exercise its discretion to remand a claim where there are multiple issues and little evidentiary record to review"); *Rankins v. Long Term Disability Plan for Emples. of the Franklin Ins. Co.*, 6 F.Supp.2d 988, 992 (C.D. Ill. 1998) (noting that "there is clearly persuasive authority that a remand to the plan administrator where the factual determinations have not been made is proper, even where the court reviews the plan administrator's decision *de novo*"). Remand is similarly appropriate at the summary judgment stage. *See, e.g., Touhey v. Hartford Life & Accident Ins. Co.*, No. 4:10–CV–1440, 2012 WL 2568185, at *4–5, 2012 U.S. Dist. LEXIS at 10–13 (E.D. Mo. Jul. 3, 2012) (making no finding on the applicable standard of review but remanding review of benefits claim to administrator at summary judgment stage); *Miller v. Monumental Life Ins. Co.*, 761 F.Supp.2d 1123, 1153, 1158 (D. N.M. 2009) (remanding to plan administrator at summary judgment stage where it found that

"the record is inadequate for appropriate judicial decision-making"); *Cate v. CNA Ins. Cos.*, 965 F.Supp. 1039, 1044–47 (M.D. Tenn. 1997) (conducting de novo review of benefits determination at summary judgment stage and "remand[ing] the action to the plan administrator for reconsideration and further development of the record").

■■■ Here, the Court has found violations of both ERISA and the Plan's terms. There is, however, insufficient information in the administrative record upon which to determine whether Plaintiffs are entitled to benefits, and as discussed, the Court declines to look beyond the administrative record. Remand of Plaintiffs' benefits claims to CMC and Excellus will afford all parties the opportunity for a full and fair review, with expert consideration of all relevant evidence under the appropriate standards.[32] Plaintiffs argue that they "would not receive a full and fair review" on remand, because Defendants have "attempt[ed]" in this litigation to "deny the claims based on an incorrect reading of the PPO Member Contract and an incorrect interpretation of the parity laws." (Dkt. No. 52, p. 11). The Second Circuit has discouraged remand to an ERISA administrator if the process would be a "useless formality;" *Miller*, 72 F.3d at 1071, however, there is no indication that would be the case here. Even though Excellus has taken a litigation stance on the merits of Plaintiffs' entitlement to *inpatient* benefits, it has not done so with respect to *outpatient* benefits. (Dkt. No. 51, pp. 7–10). Thus, Plaintiffs have potential benefits for which denial is not a foregone conclusion. Moreover, remand will at least allow for adequate development of the administrative record, which at present is insufficient for

---

32. The Court notes that, in its memoranda of law, Excellus argues that remand is the proper remedy if the Court chooses not to dismiss

Plaintiffs' complaint in its entirety. (Dkt. No. 42–15, p. 24; Dkt. No. 51, p. 11).

a decision on the merits. Thus, remand is not a "useless formality" and is, in fact, the proper course to allow a full and fair review of the claims at issue.

## C. ERISA § 502(a)(3) Claims to Remedy Breach of Fiduciary Duty

■ Plaintiffs allege that Defendants breached their fiduciary duties by misinforming Plaintiffs about how to file claims and by failing to maintain a reasonable claims procedure, in violation of ERISA § 502(a)(3). (Dkt. No. 45, pp. 14–16). The section provides:

> A civil action may be brought [ ] by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan.

29 U.S.C. § 1132(a)(3). In *New York State Psychiatric Ass'n*, the Second Circuit noted that § 502(a)(3) is a "catchall provision" that "acts as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." 798 F.3d at 134 (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (internal quotation marks and alteration omitted)). Though § 502(a)(3) provides for equitable relief, it does not permit Plaintiffs to recover monetary damages. *Bell v. Pfizer, Inc.*, 626 F.3d 66, 77 (2d Cir. 2010).

### 1) As against the CMC Defendants

Plaintiffs fail to articulate a breach of fiduciary duty claim against the Plan. To the extent that the Second Amended Complaint asserts such a claim against the Plan, it is dismissed.

■ Plaintiffs further assert that CMC breached fiduciary duties by misinforming Plaintiffs about how to file claims and by failing in the responsibility to maintain a reasonable claims procedure. (Dkt. No. 45, pp. 14–16). CMC argues that because Plaintiffs are pursuing a claim for benefits under § 502(a)(1)(B), "they cannot also pursue breach of fiduciary duty or of claims procedures causes of action." (Dkt. No. 50, p. 10). To the extent that Plaintiffs' injury as a result of these alleged breaches consists of unpaid benefits, § 502(a)(1)(B) provides an adequate remedy. *See Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213–14, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002).

Plaintiffs, however, claim entitlement to monetary relief under an equitable theory as well. (Dkt. No. 27, p. 14). Construing *Great–West Life & Annuity*, the Second Circuit recently adopted a bright-line rule to distinguish equitable and legal monetary claims. In *Cent. States, Southeast & Southwest Areas Health & Welfare Fund v. Gerber Life Ins. Co.*, the court noted that "the key factor" in determining whether a claim was legal or equitable is "whether a claimant was seeking restitution from a defendant's general funds, in which case the claim was legal, or whether a claimant was seeking to recover money that could be traced to a particular fund held by a defendant, in which case the claim was equitable." 771 F.3d 150, 155 (2d Cir. 2014); *see also Severstal Wheeling, Inc. Ret. Comm. v. WHX Corp.*, No. 15–2866, 659 Fed.Appx. 28, 31, 2016 WL 4543094, at *2, 2016 U.S. App. LEXIS 15971, at *6 (2d Cir. 2016) (applying the same test). The *Cent. States* court held that the relief sought by the plaintiffs in that case "is not equitable because it does not assert title or right to possession of particular property, but simply asserts a claim against [the defendant's] general assets." *Cent. States, Southeast & Southwest Areas Health &*

*Welfare Fund*, 771 F.3d at 155. Consequently, the *Cent. States* plaintiffs could not recover on that theory. *Id.* In this case, Plaintiffs likewise assert a claim for equitable monetary relief against the Plan's general assets; there is no indication that they seek money that could be traced to specific property. (Dkt. No. 27, p. 14).[33] Thus, Plaintiffs' claim for money under an equitable theory is legal in nature and unavailable under 502(a)(3).

Unlike the litigation in *New York State Psychiatric Ass'n*, this matter has progressed to a stage where the Court can determine whether § 502(a)(1)(B) provides all appropriate remedies or whether Plaintiffs have remaining equitable remedies in play. 798 F.3d at 134 (noting that, at the motion to dismiss stage of litigation, it was "not clear" whether monetary benefits under § 502(a)(1)(B) "alone will provide [ ] a sufficient remedy"). Here, at summary judgment, Plaintiffs have had the opportunity to present claims and arguments supporting entitlement to equitable relief. In light of the Second Circuit precedent cited above, Plaintiffs' inability to link a monetary equitable claim to traceable property is fatal to its claim for such money. *See Cent. States, Southeast & Southwest Areas Health & Welfare Fund*, 771 F.3d at 155. Plaintiffs also seek "an order compelling Defendants to pay Plaintiffs' benefits incurred to date, plus prejudgment interest," "an order compelling Defendants to pay

Plaintiffs' future mental health benefits ... as long as Plaintiff B.E. is eligible under the Plan and the facility is medically necessary," and any other "relief the Court deems just and proper." (Dkt. No. 27, p. 14). The Court declines to grant such relief. The injunctive orders Plaintiffs seek are duplicative of relief they will receive on remand if B.E. is eligible for benefits, and if B.E. is not eligible, Plaintiffs are not entitled to such orders. The Court is aware of no other non-monetary relief that would address Plaintiffs' alleged harm.[34]

In sum, Plaintiffs' breach of fiduciary duty claim against CMC only sufficiently addresses unavailable monetary relief and duplicative relief based on the claim for benefits due under § 502(a)(1)(B). Therefore, the claim is dismissed.

### 2) As against Excellus

Plaintiffs' claim for breach of fiduciary duty against Excellus requires a different analysis. The Second Circuit has noted that the "threshold question" in every ERISA fiduciary duty claim is "not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Bell*, 626 F.3d at 73 (internal quotation omitted).

---

**33.** The Court notes that in their briefing on this issue, Plaintiffs did not address how their request for a remedy of "an equitable accounting" and "disgorgement of any profits" stemming from the withheld benefits (Dkt. No 27, p. 14), is a claim for money that can be traced to specific property.

**34.** Plaintiffs' memoranda of law also hint at potential equitable remedies stemming from operation of mental health parity laws. (Dkt. No. 43-9, pp. 20-24; Dkt. No. 46, pp. 5, 15; Dkt. No. 53, pp. 9-13). However, Plaintiffs have not pled or cognizably argued what that

duty might be or how it applies to these facts. Plaintiffs' vague citation to *New York State Psychiatric Ass'n* in one of its response memoranda is insufficient. (*See* Dkt. No. 46, p. 5 n.1) (citing *New York State Psychiatric Ass'n*, and arguing that "whether or not [Excellus] acts as an insurer or a claims administrator for any particular plan, ERISA § 503(a)(3) 'may impose a fiduciary duty arising indirectly from [the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ...] even if the Parity Act does not directly impose such a duty' ").

The Second Circuit has explained that an entity's fiduciary status "must be determined by focusing on the function performed, rather than on the title held" and that "[a]n entity need not have absolute discretion with respect to a benefit plan in order to be considered a fiduciary; rather, fiduciary status exists with respect to any activity enumerated in the statute over which the entity exercises discretion or control." *Severstal Wheeling, Inc. Ret. Comm.*, 659 Fed.Appx. at 30, 2016 WL 4543094, at *2, 2016 U.S. App. LEXIS 15971, at *4 (quoting *Blatt v. Marshall & Lassman*, 812 F.2d 810 (2d Cir. 1987)). Furthermore, an entity "may be an ERISA fiduciary with respect to certain matters but not others." *Coulter v. Morgan Stanley & Co.*, 753 F.3d 361, 366 (2d Cir. 2014).

■ Under the ERISA statute,

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation ... with respect to any moneys or other property of such plan ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21). The Second Circuit construes this definition broadly, but recognizes that "even [this] broad construction has limits." *Gill v. Bausch & Lomb Supplemental Ret. Income Plan I*, 1 F.Supp.3d 72, 81 (2d Cir. 2014) (quoting *Bell*, 626 F.3d at 74) (brackets original in *Bell* )). For example, "falling outside the ambit of ERISA are those individuals 'who perform ministerial tasks with respect to the plan.'" *Id.*

Under 29 C.F.R. § 2509.75–8(D–2), "administrative functions for an employee benefit plan" such as "application of rules determining eligibility for participation or benefits," "calculation of benefits," and "processing of claims" are "ministerial functions" that do not make the actor a fiduciary. However, many courts have distinguished these functions from the granting or denying of claims, which can establish fiduciary status. *See, e.g., Sixty–Five Sec. Plan v. Blue Cross & Blue Shield*, 583 F.Supp. 380, 385 (S.D.N.Y. 1984) (noting that "discretion to grant or deny claims ... has been held sufficient to support a finding of fiduciary status); *Blake v. Metro. Life Ins. Co.*, 415 Fed.Appx. 571, 573 (5th Cir. 2011) (noting that "[t]he authority to grant, deny, or review denied claims can ... make one a fiduciary") (internal citation omitted); *Aetna Life Ins. Co. v. Bayona*, 223 F.3d 1030, 1033 (9th Cir. 2000) (noting that "[w]hen an insurance company administers claims for an employee welfare benefit plan and has authority to grant or deny the claims, the company is an ERISA fiduciary"); *Sun Life Assur. Co. of Can. v. Diaz*, 2015 WL 1826088, at *3, 2015 U.S. Dist. LEXIS 52654, at *7–8 (D. Conn. 2015) (noting that "[m]ost courts recognize that entities exercising discretionary authority with respect to payment of claims are ERISA fiduciaries").

■ In this case, the ASC states that "[CMC] shall serve as the appropriate 'named fiduciary' as defined by ERISA, for the purpose of reviewing and making decisions on claims denials" and further provides that "Excellus ... shall have no fiduciary obligations under the Benefit Plan, except as specifically set forth in paragraphs 5.1, 5.3, and 5.11 of this Agreement." (Dkt. No. 43–4, p. 15). The ASC, however, does not discuss fiduciary duties in the aforementioned paragraphs, which pertain to payment of benefits and proce-

dures for processing benefits claims. (Dkt. No. 43–4). The ASC also states that "[t]o the full extent permitted by law,"

> [CMC] shall have the *sole authority and discretion* to construe any uncertain or disputed term or provision of the Benefit Plan, including, but not limited to
>
> i. determining whether an individual is eligible for benefits under the Benefit Plan;
>
> ii. determining the amount of benefits, if any, to which an individual is entitled;
>
> iii. interpreting applicable terms of the Benefit Plan; and
>
> iv. making factual findings relevant to determining eligibility and benefit amounts

(*Id.* at p. 16) (emphasis added).

The activity at issue in this case is Excellus' receipt of Plaintiffs' claims, recognition that Plaintiffs had submitted insufficient information for a decision on the merits, and its responses. This process involved no disposition of the Plan's assets. Furthermore, the PPO Contract as adopted by the Plan *requires* Excellus to first request additional information from claimants before issuing a denial based on lack of information. (Dkt. No. 41–6, p. 42) ("This acknowledgement *will* . . . if necessary, inform you of any additional information needed before a decision can be made.") (emphasis added). Thus, Excellus' requests for information were not an exer-

cise of discretion. Excellus likewise had no discretion to stop Plaintiffs from appealing after its failure to render a timely adverse benefit determination. (*See* Dkt. No. 41–6, p. 41) ("Our failure to make a Utilization Review determination within the applicable time frames . . . shall be deemed an adverse determination subject to an internal appeal."); *see also* 29 C.F.R. § 2560.503–1(1).

In this way, Excellus' actions are unlike a substantive grant or denial of a benefits claim, but instead constitute precisely the type of ministerial function that precludes liability for breach of a fiduciary duty.[35] *See Bell*, 626 F.3d at 74 (noting that ministerial tasks "have been held not to require the exercise of discretionary authority and do not, therefore, implicate any fiduciary duty"). Therefore, even if Excellus is a de facto fiduciary with respect to some of its services under the Plan, it cannot commit a breach of fiduciary duty through nondiscretionary application of a Plan rule that it does not interpret or otherwise control.[36] That Excellus failed to perform these ministerial functions in an effective or even lawful manner is irrelevant to this claim. *See S.M. v. Oxford Health Plans (NY), Inc.*, 94 F.Supp.3d 481, 513 (S.D.N.Y. 2015) (noting that "allegations regarding the negligent and even the intentionally poor performance of administrative tasks cannot suffice to constitute breaches of fiduciary duties") (alterations

---

**35.** Courts may consider claims processing as a sequence of different stages and find fiduciary duties at some stages but not others. *See, e.g., Gates v. United Healthcare Ins. Co.*, No. 11–CV–3487, 2014 WL 5800573, at *15, 2014 U.S. Dist. LEXIS 158330, at *42–43 (S.D.N.Y. Nov. 7, 2014) (noting that the administrator "was wearing more than one hat at different points in the process of considering and then paying out a particular amount of benefits" and that "some of its acts were merely ministerial, others were not").

**36.** Though the PPO Contract is an Excellus document, the CMC Defendants control and authorize it under the ASC, which notes "[CMC] expressly approves the terms and conditions set forth in the [PPO Contract] . . ., which define(s) the benefits available to Participants under the Benefit Plan." (Dkt. No. 43–4, p. 10). Thus, with respect to Plaintiffs' benefits claims, Excellus did not "control" the rule at issue.

and quotations omitted). Thus, even where Excellus failed to adequately inform Plaintiffs of their ability to appeal, Excellus did not breach a fiduciary duty because it had no authority or discretion to decide whether Plaintiffs could appeal. Plaintiffs' claim for breach of fiduciary duty under § 502(a)(3) is therefore dismissed as against Excellus.

## D. ERISA § 502(a)(3) Claims to Remedy Breach of Claims Procedure

For the same reasons noted above, there is no basis for any equitable relief other than remand. Consequently, the claim for breach of claims procedure is dismissed as against the CMC Defendants.

 Conversely, Plaintiffs are entitled to relief under their § 502(a)(3) claim against Excellus.[37] As noted above, the Court finds as a matter of law that Excellus failed to abide by ERISA claims procedures and the requirements of the Plan through its communicative failures and otherwise deficient conduct. However, for reasons previously stated, Plaintiffs are unable to assert a claim under § 502(a)(1)(B) against Excellus. As noted above, the § 502(a)(3) "catchall" provision affords "appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *New York State Psychiatric Ass'n*, 798 F.3d at 134. Remand to CMC alone under § 502(a)(1)(B) may not adequately address Plaintiffs' injury because Plaintiffs are entitled to a first-level review of their benefits claims and Excellus is the party that conducts such a review. Therefore, although monetary relief is inappropriate as against Excellus, injunctive relief is proper. For the same reasons noted above, the Court remands consideration of Plaintiffs' claims for benefits. Excellus is ordered to participate in the remanded administrative determination in accordance with this Opinion.

## E. ERISA § 502(a)(1)(A) Claims for Administrator's Refusal to Supply Requested Information within 30 Days [38]

Finally, Plaintiffs bring a claim under ERISA § 502(a)(1)(A) seeking to recover for CMC's failure to supply requested information within 30 days. Section 502(a)(1)(A) permits a participant or beneficiary of an ERISA plan to bring a civil action for the relief available under subsection (c), which states in relevant part:

> Any administrator ... who fails or refuses to comply with a request for any information which such administrator is required by this title to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary

---

37. Excellus argues that Plaintiffs' claim against it for breach of claims procedure is improper because ERISA § 503 "by its terms, only applies to the actual 'benefit plan,' not a claims administrator, and it only applies where a claim is actually denied, not returned." (Dkt. No. 42–15, p. 23). However, the language of § 502(a)(3) specifies that it provides equitable remedies for both "any act or practice which violates any provision of this subchapter" *and any act or practice* "which violates ... the terms of the plan."

Thus, *even if* Excellus is not a proper defendant under § 502(a)(3) with respect to violations of ERISA, it is still a proper defendant under that provision because it has unquestionably violated the terms of the Plan.

38. The Court notes that pursuant to a stipulation by all parties, United States Magistrate Judge Thérèse Wiley Dancks dismissed Plaintiffs' claim under ERISA 502(a)(1)(A) as against Excellus. (Dkt. No. 37).

within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1)(B).[39] Plan Administrators are required, "upon written request of any participant or beneficiary, [to] furnish a copy of the ... trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4).

 "The imposition of penalties for violating [§ 1024(b)(4)] is left to the discretion of the district court." *Lavigna v. State Farm Mut. Auto. Ins. Co.*, 736 F.Supp.2d 504, 515 (N.D.N.Y. 2010) (quoting *McDonald v. Pension Plan of the NYSA–ILA Pension Trust Fund*, 320 F.3d 151, 163 (2d Cir. 2003) (alteration original in *Lavigna*, quotation marks omitted). In exercising this discretion, district courts consider: (1) the administrator's bad faith or intentional conduct; (2) the length of the delay; (3) the number of requests made; (4) the extent and importance of the documents withheld; and (5) the existence of any prejudice to the participant or beneficiary. *Id.* "The presence or absence of any one of the factors, including prejudice, is not dispositive on the issue of sanctions." *Id.*

 CMC contends that Plaintiffs never requested the PPO Contract and that they provided all documents Plaintiffs requested. (Dkt. No. 41–23, p. 17). The parties do not dispute, however, that on May 14, 2013, Plaintiffs' counsel emailed CMC stating that Plaintiffs "were requesting a copy of the plan document to evaluate Jennifer's plan coverage for her son." Plaintiffs' counsel continued:

> While the summary plan description could possibly meet our needs if it is detailed and in compliance with ERISA, my experience with insured plans is that they typically do not have such SPDs, thus you will likely need to send me the certificate of insurance *or whatever serves as your full plan document. Please provide that to me as soon as possible.*

(Dkt. No. 43–5, p. 39) (emphasis added). CMC argues that Plaintiffs requested and received the Plan Document—that is, the document which memorializes the Plan. (Dkt. No. 42–2). However, even construing the facts in a light most favorable to CMC, no reasonable fact finder could conclude that Plaintiffs were seeking anything other than the PPO Contract. In the email, Plaintiffs requested the plan document that contained coverage information and indicated that they needed "detailed" information about the plan. (Dkt. No. 43–5, p. 39). The Plan Document, however, contains no specific information about coverage, but instead outlines formation of the plan and responsibilities of the plan administrator; thus, there is no basis for concluding that CMC adequately responded to Plaintiffs' request.

The Court does not fault Plaintiffs for not knowing the title of the PPO Contract. In fact, although CMC refers to it as the "PPO Member Contract," the title on the document's cover page is "Member Contract and Other Legal Information" and Excellus refers to it as the "benefit booklet." (Dkt. No. 41–23, pp. 15–16; Dkt. No. 41–6, p. 2; Dkt. No. 42–15, p. 7). It would be nonsensical to permit a plan administrator to invent a title for a document, and to

---

**39.** For violations occurring after July 29, 1997, "the maximum amount of the civil monetary penalty established by section 502(c)(1) of [ERISA]" was increased from $100 a day to $110 a day. *See* 29 C.F.R. § 2575.502c–1.

then excuse the administrator's failure to provide such a document because the participant is unaware of how the administrator refers to it. Under these facts, Plaintiffs' clear written request for a document that contains the complete terms governing benefits under the plan triggered the plan administrator's requirement to provide the document, even though Plaintiffs did not ask for it by name. *See Firestone Tire & Rubber Co.*, 489 U.S. at 118, 109 S.Ct. 948 (noting that "Congress' purpose in enacting the ERISA disclosure provisions" was to "ensur[e] that the individual participant knows exactly where he stands with respect to the plan") (citing legislative history).

CMC raises several additional arguments against its liability for penalties under § 502(a)(1)(A), each of which fail. Citing *Cherry v. Toussaint*, CMC argues that "the statute does not explicitly provide for responses to requests ... for certain information that may be contained in one of the enumerated instruments" and notes that the *Cherry* court "determin[ed] that the plan administrator satisfied its statutory obligation to provide documents upon written request where it provided a different financial document instead of the annual statement" and where the former document contained all the relevant information. (Dkt. No. 48, p. 20); *see also Cherry v. Toussaint*, No. 01 Civ. 6726, 2003 WL 21767759, *3, 2003 U.S. Dist. LEXIS 13196, at *3 (S.D.N.Y. Jul. 30, 2003). Here, unlike *Cherry*, Plaintiffs requested "whatever serves as [the] full plan document" for benefits coverage—it is undisputed that the PPO Contract contains more detailed benefits information than the documents that CMC provided.

In addition, CMC argues that Plaintiffs did not "make follow up requests" after not receiving the PPO Contract, which—it argues—demonstrates "indifference" and "indicate[s] that [Plaintiffs] were not prejudiced by [CMC's] failure to supply [that] document[ ]." (Dkt. No. 41–23, p. 20) (citing *Reinhart v. Broadspire Servs.*, No. 06–CV–752S, 2011 WL 3273152, at *11, 2011 U.S. Dist. LEXIS 83493, at *30–33 (W.D.N.Y. Jul. 29, 2011)). The Court need not determine whether the facts support CMC's assertion because, even if it were true, the reasoning would speak only to prejudice, which is merely one of five relevant factors. Furthermore, the facts of this case are readily distinguished from those in *Reinhart*, because here, Plaintiffs can demonstrate at least one written request for the document at issue. *See id.* As such, even a finding that Plaintiffs were not prejudiced would not necessarily vindicate CMC.

CMC further argues that "the PPO Member Contract is an Excellus document and was not even in CMC's possession at the time of Plaintiffs' requests" and notes that an employer "cannot be held liable for not producing documents that are not in its possession." (Dkt. No. 48, p. 21); *see also Bey v. I.B.E.W. Local Union No. 3*, No. 05 Civ. 7910, 2008 WL 821862, *24, 2008 U.S. Dist. LEXIS 24817 (S.D.N.Y. Mar. 26, 2008). This argument, too, is unavailing. In *Bey*, the documents at issue pertained to whether an individual had completed an apprenticeship program, and the union in that case had informed the plaintiff that it did not have the documents. *Id.* In contrast, here the document at issue is the PPO Contract—one of the main plan documents that governs the benefits available to participants. The ASC, which CMC signed, expressly incorporates the PPO Contract (though, as noted above, refers to it as the "benefit booklet"). (Dkt. No. 43–4, p. 10). Thus, CMC either constructively possessed the PPO Contract or knew exactly how to obtain it. Its failure to provide the document is inexcusable under § 502(a)(1)(A).

Because the May 14, 2013 email can only be considered a request for the PPO Contract, and there is no dispute that CMC failed to then provide it, Plaintiffs are entitled to summary judgment on their claim under § 502(a)(1)(A). The appropriate relief, however, cannot be determined at this juncture as certain relevant facts remain in dispute. A reasonable fact finder could conclude that Plaintiffs made a sufficiently clear request for the PPO Contract *before* the May 14 email. Additionally, the parties dispute the number of requests that Plaintiffs made to receive this and other relevant documents. (Dkt. No. 45–1, ¶¶ 41–54). These facts inform whether the administrator acted intentionally or in bad faith, the length of the delay, and the number of requests made—three of the five factors that govern the imposition of monetary penalties under § 502(a)(1)(A). *See Lavigna*, 736 F.Supp.2d at 515. Thus, the issue of monetary relief must be left for trial.

In their memorandum of law, Plaintiffs only argue for an award against CMC, not the plan. (*See, e.g.*, Dkt. No. 43–9, p. 23 ("Consequently, Plaintiff asserts she is entitled to full penalties from the Plan Administrator of $84,480.")). The ERISA statute clearly allows a claim for failure to provide benefits against a Plan Administrator; however, the Court is aware of no precedent in this circuit where a Plan itself was found liable under this theory. Plaintiffs' claim under § 502(a)(1)(A) is therefore dismissed as against the Plan.

## V. CONCLUSION

For these reasons, it is

**ORDERED** that Plaintiffs' motion for summary judgment (Dkt. No. 43) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Defendant Excellus' motion for summary judgment (Dkt. No. 42) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that the CMC Defendants' motion for summary judgment (Dkt. No. 41) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Plaintiffs' claim against Excellus under ERISA § 502(a)(1)(B) (Count I) is **DISMISSED** with prejudice; and it is further

**ORDERED** that, with respect to Plaintiffs' claims against Defendants CMC and Plan under ERISA § 502(a)(1)(B) (Count I) and Plaintiffs' claim against Excellus for breach of claims procedure under ERISA § 502(a)(3) (Count III), the determination of Plaintiffs' eligibility for benefits is **REMANDED** to Defendants for further administrative review in accordance with ERISA and its regulatory scheme, including but not limited to provisions codified at 29 C.F.R. § 2560.503–1. Plaintiffs shall have **THIRTY (30)** days from the filing of this Decision to re-file their benefits claims with Excellus and include any additional information. Excellus shall then conduct a first-level review of the claims in compliance with ERISA and its regulatory scheme, and further review proceed as necessary in compliance with ERISA and its regulatory scheme.

It is further **ORDERED** that Plaintiffs' claim against Defendants CMC, Plan, and Excellus for breach of fiduciary duty under ERISA § 502(a)(3) (Count II) is **DISMISSED** with prejudice; and it is further

**ORDERED** that Plaintiffs' claim against Defendants CMC and Plan for breach of claims procedure under ERISA § 502(a)(3) (Count III) is **DISMISSED** with prejudice; and it is further

**ORDERED** that Defendants CMC's and Plan's motion for summary judgment on Plaintiffs' claim under ERISA § 502(a)(1)(A) (Count IV) is **GRANTED** as

to Defendant Plan and **DENIED** as to Defendant CMC; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment on Plaintiffs' claim under ERISA § 502(a)(1)(A) as to Defendant CMC (Count IV) is **GRANTED** as to liability and **DENIED** as to damages; and it is further

**ORDERED** that the Plaintiffs and Defendant CMC are to file a letter brief, not longer than five pages, by November 28, 2016, informing the Court regarding how they seek to proceed on the issue of damages under ERISA § 502(a)(1)(A).

**IT IS SO ORDERED.**